UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

TERENCE JOHNSON,

                Plaintiff,              Case No. 1:10-cv-675

v.                                   Honorable Robert J. Jonker

STATE OF MICHIGAN et al.,

                Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has been directed to pay the initial partial filing fee when funds become available. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

## Discussion

### I.     Factual allegations

Plaintiff Terence Johnson presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Florence Crane Correctional Facility (ACF), though the actions he complains of also occurred while he was housed at the Pine River Correctional Facility (SPR), the G. Robert Cotton Correctional Facility (JCF), the Bellamy Creek Correctional Facility (IBC), and the Muskegon Correctional Facility (MCF).  He sues the following 41 Defendants: the State of Michigan; the MDOC; Governor Jennifer Granholm; Lieutenant Governor John Cherry; MDOC Director Patricia Caruso; six unknown SPR employees, including a Corrections Officer (CO), two Resident Unit Managers (RUMs), an Assistant Resident Unit Supervisor (ARUS), a Deputy Warden and the Warden; SPR; ACF Resident Unit Officers (RUOs) unknown Exelby and unknown Spedoski; ACF ARUS Brendt Rohrig; ACF Hearings Investigator J. Rohrig; ACF RUM T. Huffman; ACF Warden Carol Howes; ACF; JCF CO unknown Jupin; JCF Assistant Deputy Warden (ADW) Dennis O'Conner; JCF RUMs S. Western and C. Barret; an unknown JCF ARUS; JCF ARUSs unknown Kik and Christopher Langley; JCF Warden Deb Scutt; JCF Doctor Edward Rodriguez; JCF; Corrections Mental Health (CMH); CMH Director Roy H. Calley; IBC ARUSs James Buchene and T. Neighsonger; IBC RUM unknown Hosey; an unknown IBC ADW; IBC Warden Kenneth McKee; IBC; MCF Librarian B. Setlak; MCF ADW unknown Walker; MCF Warden Shirlee McKee; and MCF.

Plaintiff's complaint consists of a list of Defendants and a list of requested relief, together with a disordered hodgepodge of attachments and exhibits, only some of which include narrative portions.  The remainder consists of copies of prison documents, such as misconduct

hearing reports, parole assessments, mail receipts, store orders and phone lists, together with pages of letters with writing proceeding in various directions. These documents are intermingled, and the attachments are not sequential. To the best of my ability, I have pieced together Plaintiffs disordered allegations as follows.

Plaintiff complains that, during his four years of confinement, he has not been provided with contact information for media outlets. He also alleges that unnamed MDOC officials do not allow him to call unnamed federal officials. He alleges that these deprivations violate his First Amendment rights of speech, petition and the press and amount to cruel and unusual punishment under the Eighth Amendment. Further, he contends that his right to freedom of religion is violated by limits placed on his ability to bring lawsuits because it prevents him from "respecting the judicial process and every ordinance of man," as provided in the Bible. (Compl., docket #1, page ID ##52-53.)

In "Attachment F," Plaintiff complains that, while he was in the day room at JCF, he was assaulted by two inmates who disagreed with him about the television station to be watched. The assault took place outside the view of officers. Plaintiff contends that Defendants State of Michigan, Governor Granholm, Lt. Governor John Cherry, the MDOC and Patricia Caruso all failed to have adequate procedures in place that would have prevented such an assault from occurring unobserved. (Page ID #55.)

Plaintiff next alleges in "Attachment A" that, on June 22, 2006, while Plaintiff was housed at SPR, he was yelled at and assaulted by another prisoner because of the nature of his

underlying criminal offense.[1]  He alleges that all of the unknown SPR Defendants are responsible for failing to protect him from the assault because they do not have a zero tolerance policy against inmates obtaining information from families or friends about the prison offenses of other inmates. (Page ID ##56-57.)  In "Attachment B," Plaintiff alleges that, shortly after this attack, Plaintiff was transferred to ACF, where he allegedly was attacked twice more, on October 18, 2006 and on January 13, 2007.  He was found not guilty of fighting on a misconduct ticket arising out of the first attack, but was found guilty of fighting on a misconduct ticket arising out of the second attack. (Page ID #80.)

In his "Final Attachment" to the complaint, Plaintiff alleges in a conclusory fashion that the State of Michigan, the MDOC, the MDOC's division of Corrections Mental Health, Governor Granholm, and Lt. Governor John Cherry are responsible for violations of the Eighth Amendment, the Due Process Clause, the Equal Protection Clause and unspecified denials of his right of meaningful access to the courts.  (Page ID #70.)

In "Attachment C," which follows Plaintiff's "Final Attachment," Plaintiff alleges that on April 25, 2007, while Plaintiff was housed at JCF, Defendant Jupin pulled his criminal case up on the computer and then showed it to at lease one inmate, after which Plaintiff needed to sign himself into protective custody because at least one inmate had fashioned a homemade shank that he intended to use on Plaintiff.  (Page ID #72.)  On April 28, 2007, Defendants O'Conner and Langley advised Plaintiff that he would no longer be allowed to stay in protective custody, presenting him with the choice of being transferred or being placed back in the general population.  Plaintiff

---

[1]Prisoner is serving one term of two to fifteen years for second-degree criminal sexual conduct involving a person under thirteen.  *See* MICH. COMP. LAWS § 750.520c(1)(a).  From other portions of Plaintiff's documentation, it appears that the victim was his minor son, who was under ten at the time of the offense conduct.

elected to be placed back into the general population. According to Plaintiff, neither Defendant expressed outrage at Defendant Jupin's conduct. (Page ID #78.)

In a further allegation in this attachment, Plaintiff alleges that JCF Defendant Kik (formerly Oliver) interfered with his right of access and obstructed justice by preventing him from phoning an agent of the FBI and an official at the Department of Justice. (Page ID #77.) He later alleges more specifically that Kik "pretended to mistake [his] lawful Federal Contacts on [his] phone list with those of attournies [sic] not found in the bar journal." (Page ID #87.) He further alleges that Defendant Spedoski stated that Plaintiff was manipulative but not very good at it. (Page ID #87.)

Plaintiff also alleges that he spoke to JCF Defendant Western on June 28, 2007, apparently about misconduct charges she had filed against him for threatening his son in a letter.[2] Western allegedly told Plaintiff that cases like his, "[w]e take out to the back 40. Hell this is M.D.O.C." (Page ID #73.) Plaintiff complains that Defendant Western charged him with threatening and intimidating behavior toward the victim in his case, his ten-year-old son. While he was in segregation on the charge, "it hit [Plaintiff]" that the purpose of Defendant Western's misconduct charge was to create a record that would cause anyone who read his file to "tak[e] [him] out to the back 40." (Page ID ##73-74.) Plaintiff alleges that he told his psychiatrist, Defendant Dr. Edward Rodriguez, as well as his case manager, Ms. Ow, and Defendant ARUS Langley about Western's alleged threat. Plaintiff stated that he was going to get the FBI involved. Langley apparently laughed dismissively, but Rodriguez allegedly offered to help Plaintiff contact the FBI.

---

[2]Plaintiff's own included attachments indicate that Plaintiff was advised by the hearing officer that the charge against him was for threatening behavior toward the woman who cared for Plaintiff's son and the woman's boyfriend. (Page ID #51.)

Shortly thereafter, however, Rodriguez was spoken to by Defendant Barret and subsequently Rodriguez would not help Plaintiff. (Page ID #74.) Plaintiff subsequently was transferred to IBC. (Page ID #75.) Plaintiff complains that, had he not been transferred, he would not have been later assaulted. (Page ID #75.) Plaintiff names Defendant Scutt as being responsible for the conduct of Defendants Jupin and Western. (Page ID #76.) Plaintiff also alleges that Defendants Corrections Mental Health Services and its Director, Defendant Calley, are responsible for failing to protect him. (Page ID #79.)

In "Attachment B," Plaintiff alleges that, on February 15, 2010, Defendant Huffman allegedly announced a "duffle bag alert." (Page ID #81.) According to Plaintiff, this announcement began a series of events that violated his unspecified rights. On March 21, 2010, Plaintiff spoke with Defendant Brendt Rohrig and signed a request for a legal foot locker. On March 30, Plaintiff received a notice that Defendant Spedoski had issued a ticket against Plaintiff for creating a disturbance by yelling "Chow." On March 31, 2010, he received both the foot locker and the major misconduct ticket. On April 28, 2010, Spedoski wrote another ticket for interference with administrative rules based on Plaintiff's conduct in going to the T.V. room when he knew he was on "Loss of Privileges" status. Thereafter, on May 4, 2010, Plaintiff was notified that he was scheduled to meet with the Parole Board on May 24, 2010. On May 6, 2010, Defendant Spedoski notified Plaintiff that Defendant Brendt Rohrig wanted Plaintiff to pack up his legal property into his duffle bag so that Rohrig could conduct an administrative review. Plaintiff allegedly complied, but Rohrig did not ever conduct a hearing to verify that his legal property was properly designated legal property. (Page ID #81.) Instead, Plaintiff claims that Defendant Brendt Rohrig completed a COMPAS Narrative Assessment Summary on May 6, 2010 for parole purposes. Plaintiff objected

to Rohrig's assertions that Plaintiff did not accept responsibility for the crime and that Plaintiff blamed the victim. Plaintiff claims that Rohrig's statements were false and slanderous and were deliberately intended to mislead the Parole Board. (Page ID ##82-84.) He further alleges that Defendant Exelby issued him a misconduct ticket for disobeying a direct order on May 20, 2010, on the grounds that Plaintiff had packed only part of his passes and itineraries when Exelby had ordered him to pack them all. Exelby reported that, after Plaintiff had supposedly complied, Exelby found "numerous amounts of these items still in his possession . . . ." (Page ID #84.) Plaintiff does not deny the conduct, though he contends that Exelby's testimony at the misconduct hearing was dishonest in some unspecified way. (Page ID #84.) Plaintiff asserts that it is his belief that the series of actions were a concerted attempt to interfere with his meaningful access to the courts and to prevent his parole. (Page ID #85.) He contends that Defendant Huffman approved Exelby's removal of his property, saying, "Your [sic] obviously not going to get rid of it so [w]e'll take care of it. Probably destroy it." (Page ID #87.) He also contends that Defendant Warden Carol Howes is liable for the actions of her employees. (Page ID #86.)

In "Attachment E," Plaintiff alleges that, on April 7, 2009, while he was housed at MCF, he was assaulted and battered by a man of Syrian descent. CO Olenchek heard the noise and came to investigate. He told Plaintiff to inform the first shift officer to see what could be done to separate them. Plaintiff told CO Johnson, who told him she would see what could be done. An hour later, Johnson reported that they were considering placing Plaintiff into protective custody. Plaintiff asked, "Me? Why me??" (Page ID #89.) ARUS Daniels told him shortly thereafter that he had a choice either to be taken into protective custody or to sign a waiver of protective custody. Plaintiff

complains that the conditions of protective custody are like being walled off from the rest of society, so he signed the waiver. (Page ID #89.)

On December 15, 2009, while in the day room, Plaintiff became aware that another inmate had a problem with him, though Plaintiff did not know why, but he assumed that the man had learned of Plaintiff's offense conduct from the man's telephone contacts and visitors. The man attacked Plaintiff in the bathroom, but Plaintiff did not report it because he did not want to look like a "Rat." (Page ID #91.) Plaintiff also complains that, while he was at MCF, someone, whom he believed at the time to have been a corrections officer, posted a caricature of Plaintiff in the day room. (Page ID #91.)

In early January 2010, Plaintiff's MCF bunk mate, McGee, told him what prisoners were saying Plaintiff did. Plaintiff told CO Johnson and then went to his cell. Sergeant Lewis came down shortly thereafter and asked if Plaintiff sensed danger at that time. The following night, Plaintiff was told that he would be transferred in the morning. On January 4, 2010, Plaintiff packed the majority of his things and went to breakfast. He then went to the day room. McGee came in and told Plaintiff to follow him to their cell. When Plaintiff arrived at the cell, McGee was throwing Plaintiff's things into the hallway. When Plaintiff asked what he was doing, McGee attacked Plaintiff. According to Plaintiff, the only possible reason for the assault was that McGee had learned about Plaintiff's underlying offense. (Page ID #91-92.) Plaintiff later informed ARUS Brete about the incident and was told by ACF Investigator Cross that MCF inspector Sean Brewer received Plaintiff's letter and would be investigating. Plaintiff has heard nothing further. (Page ID #92.)

While Plaintiff was at MCF, he filed a habeas petition in the Eastern District of Michigan, and he sought a stay so that he could complete exhaustion of certain state-court remedies.

The court granted the motion for stay and ordered Plaintiff to file his state-court motion for relief from judgment within 90 days. *Johnson v. Harry*, No. 2:09-cv-10395 (E.D. Mich.) (Ord. Mar. 6, 2009). Plaintiff alleges that, on May 25, 2009, he submitted a photocopy request to Defendant Setlak to make copies of his motion, indicating that the document needed to go out the next morning. He indicated that the matter was time sensitive and asked that it be processed that day. On May 27, Setlak responded that she did not see in the court order where she was required to make an extra four copies and asked Plaintiff to identify how the attached 292 pages were relevant to the arguments raised. Plaintiff finally was able to mail out the brief on June 6, 2009. He filed a supplemental brief on July 4, 2009. On July 14, 2009, his motion was denied. On August 19, 2009, Plaintiff asked for two copies of the court order, apparently to attach to his application for leave to appeal. Setlak allegedly denied an indigent loan for the purpose, indicating that the court order did not require her to make such a copy. Plaintiff filed a delayed application for leave to appeal on October 7, 2009, explaining that he had difficulty getting postage and supplies. His application was denied on November 17, 2009, and Plaintiff believes that the result would have been different if he had submitted additional background. Plaintiff then had 56 days to seek leave to appeal to the Michigan Supreme Court. He brought his completed brief to Defendant Setlak on January 4, 2010. Because Plaintiff was being transferred that same day, Setlak did not make the copies, but instead turned the documents over to the quartermaster for transfer with Plaintiff to the next facility, informing Plaintiff that he would pick up his documents at the next facility. Plaintiff alleges that Defendants ADW Walker, Warden Harry and MCF are responsible for Setlak's conduct. (Page ID #94-95.)

In Plaintiff's next attachment, "Attachment D," he alleges that, after Defendants Barret and Langley transferred him to IBC in 2007, he suffered other injuries. On October 17, 2007,

he tried to send a letter to the United States Marshal's Office in Detroit as legal mail. Defendant ARUS Neighsonger, after initially approving the disbursement, returned the letter to Plaintiff, informing him that the mail was not legal mail. Plaintiff also alleges that Neighsonger did not allow Plaintiff to include the U.S. Marshal's office, the Legal Aid and Defender's Office and the American Civil Liberties Union on his list of approved telephone contacts on the pretext that the individuals were attorneys not listed in the Michigan Bar Journal. He alleges that in both ways Neighsonger interfered with his right of access to the courts and obstructed justice. (Page ID ##97-99.)

Plaintiff also alleges in "Attachment D" that he was attacked twice while housed at IBC. In the first instance, on October 5, 2008, inmate Reed knocked Plaintiff to the floor and then jumped on him, causing back injuries. The attack occurred in front of corrections personnel and other inmates. Plaintiff was not ticketed for the incident, but Reed was. Plaintiff was kept in segregation while the attack was investigated. Plaintiff never reported his injuries to corrections personnel. Plaintiff subsequently was attacked by inmate Joe Jackson, causing a major gash to Plaintiff's head. Plaintiff was not ticketed, though Jackson was. Plaintiff was then transferred for his safety. Plaintiff alleges that Defendants Buchene and Hosey are responsible for failing to implement a zero tolerance policy that allegedly would prevent attacks. He alleges that Defendants Warden McKee and an unknown deputy warden were responsible for the actions of their employees. (Page ID ##100-102.)

For relief, Plaintiff seeks release from prison, removal from all sex offender registries, expungement of his conviction, return of all confiscated property, together with compensatory and punitive damages.

II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Ashcroft*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify

the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Sovereign Immunity

Plaintiff may not maintain a § 1983 action against the State of Michigan, the MDOC, Corrections Mental Health, and five prison facilities:  SPR, ACF, JCF, IBC, and MCF.  The five prisons and Corrections Mental Health are part of the MDOC.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment.  *See*, *e.g.*, *McCoy v. Michigan*, No. 08-1541, 2010 WL 841198, at *7 (6th Cir. Mar. 12, 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000).  In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).  Therefore, the Court dismisses the State of Michigan, the MDOC, Corrections Mental Health, SPR, ACF, JCF, IBC, and MCF.

**B.    Supervisory Liability**

Plaintiff fails to make specific factual allegations against Defendants Granholm, Cherry, Caruso, Howes, Scutt, McKee, Walker, Harry, Calley, Buchene, Hosey, an unknown Deputy Warden at IBC, and an unknown Warden and Deputy Warden at SPR, other than his claim that they failed to properly supervise or prevent the actions of other Defendants.   Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009); *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).  A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).  The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summer v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).   Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft*, 129 S. Ct. at 1948.  Plaintiff has failed to allege that Defendants Granholm, Cherry, Caruso, Howes, Scutt, McKee, Walker, Harry, Calley, Buchene, Hosey, an unknown Deputy Warden at IBC, and the unknown Warden and Deputy Warden at SPR engaged in any active unconstitutional behavior.  Accordingly, he fails to state a claim against them.

## C.    Lack of Allegations

Although Plaintiff has named Hearing Investigator J. Rohrig as a Defendant in this action, the body of his complaint contains no factual allegations against J. Rohrig. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries"); *see also Krych v. Hvass*, 83 F. App'x 854, 855 (8th Cir. 2003); *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974); *Williams v. Hopkins*, No. 06-14064, 2007 WL 2572406, at *4 (E.D. Mich. Sept. 6, 2007); *McCoy v. McBride*, No. 3:96-cv-227RP, 1996 WL 697937, at *2 (N.D. Ind. Nov. 5, 1996); *Eckford-El v. Toombs*, 760 F. Supp. 1267, 1272-73 (W.D. Mich. 1991). Because Plaintiff's claim falls far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"), his complaint must be dismissed against Defendant J. Rohrig.

### D.    Eighth Amendment – Assaults by Other Prisoners

Plaintiff contends that a variety of Defendants are responsible for failing to prevent assaults by other prisoners at a variety of prisons.  The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency."  *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain."  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."  *Ivey*, 832 F.2d at 954.

In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).  To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the defendant would cause prisoners serious harm.  *Farmer,* 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir.

1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995). *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

A claim of deliberate indifference has an objective and a subjective component. *Farmer*, 511 U.S. at 834. Under the objective component, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind . . . ." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1.      SPR assault

Plaintiff first alleges that he was assaulted by two inmates at SPR while he was in the day room, apparently as a result of a disagreement over which television program was going to be watched. Unnamed corrections officers did not see the assault, but Plaintiff alleges that they and their supervisors should have had in place procedures that would have prevented such an assault. Plaintiff's allegations against the SPR Defendants fall far short of alleging that they were deliberately indifferent to a known serious risk to Plaintiff. He has not alleged that the SPR Defendants were aware that he was exposed to a substantial risk of assault over a television program, nor does he

allege that they ignored the risk. Plaintiff therefore fails to state a claim against the SPR Defendants.[3]

### 2. MCF assault

Plaintiff next alleges that he was assaulted by an inmate at MCF. Plaintiff does not allege that any Defendant was aware that the prisoner was likely to assault him. CO Olenchek heard the disturbance and ended the altercation. CO Johnson attempted to see what could be done to prevent further danger to Plaintiff. Ultimately ARUS Daniels offered Plaintiff the opportunity to be placed in protective custody, but Plaintiff preferred to sign a waiver of protective custody. Plaintiff's allegations against MCF officials fail to demonstrate deliberate indifference. Indeed, those officials were responsive once aware of a risk to Plaintiff. Plaintiff was offered protective custody, but he declined because he did not like being in protective custody. The Eighth Amendment, however, is not offended by placement in protective custody. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). By offering to place him in protective

---

[3]The Court also notes that Plaintiff's claims against the SPR Defendants are time-barred. For civil rights suits filed in Michigan under § 1983, the statute of limitations is three years. *See* MICH. COMP. LAWS § 600.5805(10); *Carroll v. Wilkerson*, 782 F.2d 44, 44 (6th Cir. 1986) (per curiam); *Stafford v. Vaughn*, No. 97-2239, 1999 WL 96990, at *1 (6th Cir. Feb. 2, 1999). Accrual of the claim for relief, however, is a question of federal law. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). The statute of limitations begins to run when the aggrieved party knows or has reason to know of the injury that is the basis of his action. *Collyer*, 98 F.3d at 220. Plaintiff had reason to know of his injury in June 2006, when the assault occurred. He did not file the instant action until July 2010, more than four years after his action accrued. His claims against the SPR Defendants therefore may be dismissed on the alternative ground that they are untimely.

custody, prison officials took "reasonable measures" to ensure Plaintiff's safety. *Farmer*, 511 U.S. at 832. Plaintiff therefore fails to state a claim against any Defendant with respect to this incident.[4]

Plaintiff next alleges that, on December 15, 2009, an MCF inmate engaged in threatening behavior and later attacked Plaintiff in the bathroom. By Plaintiff's own admission, however, he did not report either the threatening behavior or the assault, and he makes no allegation that a particular Defendant was otherwise aware of a serious risk to Plaintiff. He therefore fails to allege that any Defendant was deliberately indifferent to serious risks to his safety. Moreover, when Plaintiff's bunk mate made him aware that other prisoners had become aware of Plaintiff's offense conduct, MCF officers asked Plaintiff if he sensed danger at that time, and they arranged to transfer Plaintiff to another facility in order to protect him. No allegation indicates that any Defendant was aware that Plaintiff's own bunk mate, with whom Plaintiff acknowledges he had no problems, would assault Plaintiff the next day, an hour before he was supposed to transfer. Plaintiff again fails to state a claim arising out of the incident. As a consequence, Plaintiff fails to state a claim against any MCF Defendant.

### 3. Threatened JCF assault

Plaintiff also alleges that, while he was housed at JCF, Defendant CO Jupin accessed Plaintiff's criminal case on the computer and showed it to at least one inmate. Plaintiff alleges the conduct placed him in serious danger of being assaulted. A prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim. He must, however, at least establish that he reasonably fears such an attack. *Thompson v. County of Medina, Ohio*, 29 F.3d 238,

---

[4]Moreover, Plaintiff does not name as a Defendant any of the corrections officers he references in these allegations. Instead, he sues only Warden McKee and an unknown Deputy Warden for failure to supervise.

242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.") Here, the Court will assume that Jupin's conduct was intentional and had the potential to create a serious risk of assault. According to Plaintiff's complaint, however, he was immediately placed in protective custody to prevent such an assault. Within two days, Defendants O'Conner and Langley offered Plaintiff the opportunity to transfer to another facility. Plaintiff elected to be placed back in the general population rather than being transferred. As a consequence, Plaintiff was exposed to no period of serious risk of assault, except after he elected to forego the protective measures offered by Defendants O'Conner and Langley. By offering to transfer him to another facility, Defendants took "reasonable measures" to ensure Plaintiff's safety. *Farmer*, 511 U.S. at 832. In sum, Plaintiff fails to allege facts that would demonstrate that Jupin's conduct actually placed him at serious risk of an assault, and he fails to allege facts that would demonstrate that either O'Conner or Langley were in any way indifferent to the risks to his safety.[5]

### 4. IBC assault and threatened assault

Plaintiff next alleges that Defendant Western threatened him by saying that officers took Plaintiff's type of cases "out to the back 40." (Page ID #73.) Assuming that Defendant Western's remark could reasonably be taken as a physical threat, allegations of verbal harassment or threats by prison officials toward an inmate do not constitute punishment within the meaning of the Eighth Amendment. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987). Nor do allegations of

---

[5]In addition, Plaintiff's claims against Jupin, O'Conner and Langley are time-barred. Plaintiff had reason to know of his injury in April 2007, when Jupin allegedly showed Plaintiff's record to an inmate. He did not file the instant action until July 2010, more than three years after his action accrued. His claims against the Defendants Jupin, O'Conner, and Langley therefore may be dismissed on alternative grounds as untimely.

verbal harassment rise to the level of unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* As a consequence, Plaintiff's allegations against Western based upon her comment fail to state a claim. Because Western's "threat" did not rise to the level of an Eighth Amendment violation, Defendants Rodriguez and Langley cannot be held liable under the Eighth Amendment for failing to take action regarding the alleged threat. Similarly, Defendant Barret cannot be held liable for in some way discouraging Dr. Rodriguez from taking action.

Plaintiff also alleges that Western charged him with a misconduct ticket in order to make a record of Plaintiff's underlying criminal conduct so that anyone who read his file would be inclined to assault him. Plaintiff's allegation that the filing of a misconduct charge constituted a threat is not rationally based on any fact; instead, it is based on a series of unreasonable inferences. The allegation, therefore, is insufficient to demonstrate that Plaintiff was placed in reasonable fear of attack by Western's filing of a misconduct charge. *See Thompson*, 29 F.3d at 242-43 (requiring plaintiff to "show[] a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.")

Finally, Plaintiff alleges that he was assaulted twice at IBC, once by inmate Reed and once by inmate Jackson. Again, Plaintiff makes no allegations about the reasons for the assaults, and he fails to identify any Defendant who knew of a serious risk of assault and was deliberately indifferent to it. Indeed, Plaintiff's only allegation against IBC Defendant's Buchene and Hosey is that they should have implemented a zero-tolerance policy against prisoners knowing the underlying convictions of other prisoners, which he implies would have prevented the attacks. Plaintiff's allegation that a policy of zero tolerance would have prevented the attacks is wholly conclusory, and Plaintiff alleges no facts that would support that conclusion. Further, to the extent Plaintiff claims

that Defendants Barret and Langley transferred him to IBC, where he subsequently was attacked, Plaintiff fails to allege that either Barret or Langley would have had reason to know that Plaintiff would be at serious risk of assault at IBC. Moreover, as previously discussed, to the extent that Plaintiff implies that Buchene and Hosey are liable in their supervisory capacity, Plaintiff fails to state a claim against them. *See Ashcroft*, 129 S. Ct. at 1948.

## D.     Access to the Courts

Plaintiff alleges that he was denied reasonable access to the courts by a variety of Defendants' conduct. It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25. An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop v. Johnson*, 977 F.2d 996, 1000 (6th Cir. 1992); *Ryder v. Ochten*, No. 96-2043, 1997 WL 720482, at *1-2 (6th Cir. Nov. 12, 1997). In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351-353; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

Further, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. 353 & n.3). The *Christopher* Court held that, "[l]ike any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher*, 536 U.S. at 416.

### 1. Defendant Setlak

Plaintiff alleges that Defendant Setlak interfered with his access to the courts by failing to copy documents in a timely fashion. First, Plaintiff alleges that, on May 27, 2009, he submitted a copy request for five copies of his motion for relief from judgment, together with attachments of 292 pages. Plaintiff alleges that he indicated that the document had to be mailed the

following morning to comply with a time limit set by the Eastern District of Michigan. Plaintiff alleges that, because of Setlak's delays, the document did not get mailed until June 6, 2009. Plaintiff's allegations fail to state a claim.

First, no evidence exists that Setlak's actions were taken to interfere with Plaintiff's access to the courts. Plaintiff was indigent. It is patently obvious that Setlak had good reason to question the need for the prison to pay for the additional four copies of the motion and to investigate why the 292 pages of attachments were necessary to the motion. Second, Plaintiff's copying request was honored within a reasonable time. No basis exists to fault Setlak for not acting immediately to get papers out when Plaintiff had waited until the last minute to present them for copying. Third, Plaintiff has failed even to allege that the "delay" damaged his application for leave to appeal in the state courts or that it will impair his ability to obtain habeas corpus relief. Plaintiff therefore has failed to allege all of the essential elements of his access to the courts claim. *Christopher*, 536 U.S. at 416.

Plaintiff next alleges that Setlak failed to copy his application for leave to appeal to the Michigan Supreme Court when it was presented for copying on the day Plaintiff was being transferred. Plaintiff's allegations do not support his access-to-the-courts claim. Plaintiff's application for leave to appeal to the Michigan Supreme Court was received by that court on January 21, 2010, and the court accepted the application for filing. *See People v. Johnson*, No. 294492, Mich. Ct. App. Elec. Docket, http://coa.courts.mi.gov/resources/asp/viewdocket.asp?casenumber =294492&fparties=&inqtype=public&yr=0. Setlak's conduct not only was entirely reasonable, it did not interfere with Plaintiff seeking review of his motion for relief from judgment. *See*

*Christopher*, 536 U.S. at 415 (requiring allegations that the conduct impaired a non-frivolous civil rights or habeas claim); *Lewis*, 518 U.S. at 353 (same).

In sum, Plaintiff's allegations that Setlak denied his right of access to the courts fail to state a claim.

### 2. Defendants Neighsonger and Kik

Plaintiff alleges that Defendant Neighsonger interfered with Plaintiff's right of reasonable access to the courts and obstructed justice by not allowing Plaintiff to receive indigent postage for a mailing to the United States Marshal's Office. He also alleges the Neighsonger interfered with his right to access the courts and interfered with justice by not allowing Plaintiff to include the U.S. Marshal's Office, the Legal Aid and Defender's Office and the American Civil Liberties Union on his phone list for placing collect calls. Further, he alleges that Defendant Kik interfered with his right of access to the courts by pretending to mistake an FBI official and a Department of Justice official for attorneys, and striking their names from Plaintiff's telephone list because they were not listed in the Michigan Bar Journal.

Plaintiff wholly fails to explain why contacting any of the organizations or officials was necessary to a non-frivolous civil rights action or habeas corpus action. Plaintiff also fails to allege how Neighsonger's and Kik's denials impaired his pursuit of such an action. Further, although Plaintiff alleges that Neighsonger's and Kik's conduct obstructed justice, he does not indicate the source of a constitutional right that purportedly was infringed. The Supreme Court has never recognized a free-standing constitutional claim for obstruction of justice. For both reasons, Plaintiff fails to state a claim for relief against Defendants Neighsonger and Kik.

### 3. Defendants Huffman, B. Rohrig, Spedoski & Exelby

Plaintiff alleges that Defendants Huffman, Brendt Rohrig, Spedoski, and Exelby denied him access to the courts by forcing him to pack up his legal belongings and then failing to return some or all of his legal papers. Plaintiff, however, fails to allege that the failure to return any legal paper has interfered with his pursuit of a non-frivolous civil rights or habeas corpus proceeding. He therefore fails to state an access-to-the-courts claim against them.

### E. Due Process – Property

Plaintiff alleges that Defendants Huffman, B. Rohrig, Spedoski and Exelby improperly confiscated and failed to return his legal property without due process. Plaintiff's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. Moreover, in order to satisfy due process, the post-deprivation remedy does not have to guarantee a successful outcome, nor is required to provide relief equivalent to that available in a § 1983 action. *See Parratt*, 451 U.S. at 543-44. Instead, the Supreme Court has instructed that "[a]lthough the state remedies may not provide . . . all the relief which may have been available . . . under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt*, 451 U.S. at 544. Due process only requires that an adequate post-deprivation remedy be available when the deprivation of property occurs. *Id.* at 544. This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an

established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  Because Plaintiff's claim is premised upon allegedly unauthorized acts of state officials, he must plead and prove the inadequacy of state post-deprivation remedies.  *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993).  Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action.  *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case.  Plaintiff has not alleged that state post-deprivation remedies are inadequate.  Moreover, numerous state post-deprivation remedies are available to him.  First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation.  MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Nov. 15, 2004).  Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board.  MICH. COMP. LAWS § 600.6419; Policy Directive, 04.07.112, ¶  B.  Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies."  MICH. COMP. LAWS § 600.6419(1)(a).  The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property.  *See Copeland*, 57 F.3d at 480.  Because there were adequate post-deprivation remedies available to Plaintiff, his complaint will be dismissed.  Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property.  Accordingly, Plaintiff's due process claim based on the deprivation of his property will be dismissed.

### F. Due Process – Liberty

Plaintiff argues that Defendant Brent Rohrig violated his right to due process of law when he completed an inaccurate COMPAS Narrative Assessment Summary that had an impact on Plaintiff's likelihood of parole. To establish a procedural due process violation, a plaintiff must prove that (1) he was deprived of a protected liberty or property interest, and (2) such deprivation occurred without the requisite due process of law. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 296 (6th Cir. 2006); *see also Swihart v. Wilkinson,* 209 F. App'x 456, 458 (6th Cir. 2006). Plaintiff fails to raise a claim of constitutional magnitude because he has no liberty interest in being released on parole. There is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release. *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). Rather, a liberty interest is present only if state law entitles an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

In *Sweeton v. Brown*, 27 F.3d 1162, 1164-165 (6th Cir. 1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole. Subsequent to its 1994 decision, the Sixth Circuit has recognized the continuing validity of *Sweeton* and has continued to find that Michigan's parole scheme creates no liberty interest in being released on parole. *See Foster v. Booker*, 595 F.3d 353, 368 (6th Cir. 2010); *Ward v. Stegall*, 93 F. App'x 805, 806 (6th Cir. 2004); *Martin v. Ohio Adult*

*Parole Auth.*, 83 F. App'x 114, 155 (6th Cir. 2003); *Bullock v. McGinnis*, 5 F. App'x 340, 342 (6th Cir. 2001).

Also, in unpublished decisions, the Sixth Circuit has held that particular parts of Michigan's statutory parole scheme do not create a liberty interest in parole. *See Fifer v. Mich. Dep't of Corr.*, No. 96-2322, 1997 WL 681518, at *1 (6th Cir. Oct. 30, 1997); *Moran v. McGinnis*, No. 95-1330, 1996 WL 304344, at *2 (6th Cir. June 5, 1996); *Leaphart v. Gach*, No. 95-1639, 1995 WL 734480, at *2 (6th Cir. Dec. 11, 1995); *Vertin v. Gabry*, No. 94-2267, 1995 WL 613692, at *1 (6th Cir. Oct. 18, 1995); *Neff v. Johnson*, No. 92-1818, 1993 WL 11880, at *1 (6th Cir. Jan. 21, 1993); *Janiskee v. Mich. Dep't of Corr.*, No. 91-1103, 1991 WL 76181, at *1 (6th Cir. May 9, 1991); *Haynes v. Hudson*, No. 89-2006, 1990 WL 41025, at *1 (6th Cir. Apr. 10, 1990). In addition, the Michigan Supreme Court has recognized that there exists no liberty interest in parole under the Michigan system. *Glover v. Mich. Parole Bd.*, 596 N.W.2d 598, 603-04 (Mich. 1999).

Until Plaintiff has served his fifteen-year maximum sentence, he has no reasonable expectation of liberty. In the absence of a liberty interest, even an allegation of arbitrary or capricious denial of release on parole states no federal claim. *See Haynes*, 1990 WL 41025, at *1. The discretionary parole system in Michigan holds out "no more than a mere hope that the benefit will be obtained." *Greenholtz*, 442 U.S. at 11. The Michigan Parole Board's failure or refusal to consider plaintiff for parole, therefore, implicates no federal right.

Plaintiff's related allegation that Defendant B. Rohrig placed false information before the Parole Board also fails to state a claim. Because Plaintiff has no liberty interest in being paroled, he cannot show that any false information was relied upon to a constitutionally-significant degree. *See Caldwell v. McNutt*, No. 04-2335, 2006 WL 45275, at *1 (6th Cir. Jan. 10, 2006) ("[E]ven if the

Parole Board relied on inaccurate information to deny Caldwell parole, it did not violate any liberty interest protected by the United States Constitution."); *Echlin v. Boland*, No. 03-2309, 2004 WL 2203550, at *2 (6th Cir. Sept. 17, 2004) (prisoner could not bring a § 1983 action to challenge the information considered by the parole board because he has no liberty interest in parole); *see also Draughn v. Green*, No. 97-1263, 1999 WL 164915, at *2 (6th Cir. Mar. 12, 1999) (in order for the Due Process Clause to be implicated, false information in a prisoner's file must be relied on to a constitutionally significant degree); *Pukyrys v. Olson*, No. 95-1778, 1996 WL 636140, at *1 (6th Cir. Oct. 30, 1996) (no constitutional violation by having false information placed in a prison file); *Carson v. Little*, No. 88-1505, 1989 WL 40171, at *1 (6th Cir. Apr. 18, 1989) (inaccurate information in an inmate's file does not amount to a constitutional violation). Because Plaintiff has no liberty interest in his parole, Plaintiff fails to state a claim for a violation of his procedural due process rights.

### G.     State-Law Claims

To the extent that Plaintiff's complaint presents allegations that Defendants' actions violated state law or policy, this Court declines to exercise jurisdiction. Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). The Sixth Circuit has stated that, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and where all federal claims are dismissed prior to trial, the court ordinarily should dismiss the state-law claim without reaching its merits. *See Landefeld v. Marion Gen. Hosp.*, *Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993); *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 917 (6th Cir. 1991)). This claim will be dismissed without prejudice.

**Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee under § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated:     August 6, 2010          /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE